UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CIVIL ACTION NO. 6:08-CV-00293-JBC

RONALD DEAN WATTS                                                              PLAINTIFF,

V.             **MEMORANDUM OPINION AND ORDER**

MICHAEL ASTRUE,
SOCIAL SECURITY ADMINISTRATION,                                         DEFENDANT.

\* \* \* \* \* \* \* \* \* \*

This matter is before the court upon cross-motions for summary judgment on the plaintiff's appeal of the Commissioner's denial of his application for Disability Insurance Benefits ("DIB") and Social Security Insurance ("SSI") (R. 10, 12). The court, having reviewed the record and being otherwise sufficiently advised, will deny the plaintiff's motion and grant the defendant's motion.

I.    **Overview of the Process**

Judicial review of the decision of an Administrative Law Judge ("ALJ") to deny disability benefits is limited to determining whether there is substantial evidence to support the denial decision and whether the Secretary properly applied relevant legal standards. *Brainard v. Sec'y of Health & Servs.,* 889 F.2d 679, 981 (6th Cir. 1989) (citing *Richardson v. Perales,* 402 U.S. 389 (1971)). "Substantial evidence" is "more than a scintilla of evidence, but less than a preponderance; it is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y Health & Servs.,* 25 F..3d 284, 286 (6th Cir. 1994). The court does not try the case de novo or resolve conflicts in the evidence; it also does not decide questions of credibility. *See id.* Rather, the ALJ's decision must be affirmed if it is supported by substantial evidence, even though the court might have decided the case differently. *See Her v. Comm'r of Soc Sec.,* 203 F. 3d 388, 389-90 (6th Cir. 1999).

The ALJ, in determining disability, conducts a five-step analysis. At Step 1, the ALJ considers whether the claimant is performing substantial gainful activity; at Step 2, the ALJ determines whether one or more of the claimant's impairments are "severe"; at Step 3, the ALJ analyzes whether the claimant's impairments, singly or in combination, meet or equal a listing in the Listing of Impairments; at Step 4, the ALJ determines whether the claimant can perform past relevant work; and finally at Step 5 – the step at which the burden of proof shifts to the Commissioner – the ALJ determines, once it is established that the claimant cannot perform past relevant work, whether significant numbers of other jobs exist in the national economy which the claimant can perform. *See Preslar v Sec'y of Health & Human Servs.,* 14 F.3d 117, 1110 (6th Cir. 1994); 20 C.F.R. § 404.1520.

II.   **The ALJ's Determination**

Ronald D. Watts alleges disability beginning on September 1, 1999. AR 140. At the time of the alleged onset Watts was less than a month shy of 47

years old. Watts filed his claims for DIB and SSI on November 15, 2002. AR 140. The claims were initially denied on April 1, 2003 (AR 124), and again upon reconsideration on July 17, 2003 (AR 131). After a hearing before an Administrative Law Judge ("ALJ"), the ALJ issued a decision denying Watts's claims on March 18, 2005. AR 70. On June 26, 2006, the Appeals Council remanded the case for further proceedings. AR 604. Watts appeared for a second hearing on March 5, 2007. On April 11, 2007, ALJ Roger L. Reynolds determined that Watts did not suffer from a disability as defined by the Social Security Act. AR 41-42.

At Step 1, the ALJ found that Watts had not engaged in substantial gainful activity since the alleged disability onset date. AR 31. At Step 2, the ALJ found that Watts had severe impairments: borderline intellectual functioning, estimated; alcohol and prescription drug abuse, rule-out dependence; non-insulin-dependent diabetes mellitus; chronic neck pain, low back pain, right shoulder and right knee pain; status-post function at L5-S1; dysthymic disorder; and mild obesity. AR 32. The ALJ determined at Step 3 that Watts's impairments did not meet or equal a listing in the Listing of Impairments, 12.02, 12.04, 12.05, and 12.09. AR 36, 37.

In order to assess Watts's claim at Steps 4 and 5, the ALJ found that Watts had a residual function capacity ("RFC") to: lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 hours each in an 8-hour day; and have a sit/stand option with no prolonged standing or walking in

excess of one hour without interruption. AR 38. He found that Watts could not climb ropes, ladders or scaffolds; could occasionally climb stairs or ramps; and could occasionally bend, twist, stoop, kneel, crawl or reach overhead. AR 38. He determined that Watts requires simple entry-level work with one-two step procedures; no frequent changes in work routines; and no necessity for advanced literacy, no detailed or complex problem-solving, and no independent planning or the setting of goals. AR 38. Finally, Watts should not be exposed to concentrated temperature extremes, vibration, or industrial hazards. AR 38.

At Step 4, the ALJ found that Watts was unable to perform his past relevant work as a fork-lift operator. AR 40. Lastly, at Step 5, the ALJ determined that due to Watts's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Watts can perform. AR 40.

III. **Legal Analysis**

Watts contends that the ALJ's conclusion that he is not disabled is erroneous because the ALJ did not analyze the correct listing, 12.05(C), when determining at Step 3 that the plaintiff did not meet a Listing. R. 7. The plaintiff claims that the IQ score of 70 he received when he was in elementary school, combined with the results of the two more recent IQ tests, present a valid IQ score in the 60 – 70 range necessary to meet the 12.05(C) requirements. R. 8. In addition, the plaintiff alleges that the ALJ should have made sure that the two

4

recent IQ administrators, Dr. Couch and Annette Freel,[1] had the plaintiff's elementary school IQ test available to them when they were making their evaluations.  R. 9.

> Listing 12.05 states:
>
> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period…C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P., app. 1, § 12.05(C).

In order for the plaintiff to show that he meets the listing in 12.05(C), he must show that his impairments meet all of the necessary medical criteria. *Riley v. Apfel,* 162 F.3d 1162, at *4 (6th Cir. 1998) (citing *Sullivan v. Zebley,* 439 U.S. 521, 529-30 (1990).  For the purposes of the 12.05(C) listing, the plaintiff must show "(1) []he suffers from 'significantly subaverage general intellectual functioning,' (2) []he suffers from 'deficits in adaptive functioning,' (3) such deficits initially manifested during the developmental period (i.e., before age 22), and (4) a valid I.Q. score between 60 through 70 and an additional physical or other mental impairment." *Horne v. Commissioner,* No.1:07 -CV-1032, 2009 WL 890492, at *14 (S.D. Ohio March 30, 2009) (citing *Foster v. Halter,* 279 F.3d 348, 354-55

---

[1] Freel's examination is sometimes referred to as Catt's, but they are one and the same.  AR 690-97.  Freel was the licensed psychological associate who examined the plaintiff.  A note mentions that the report was written from the voice recordings of Annette Freel.  AR 697.  Freel apparently works for Chris Catt Consulting PSC; both Annette Freel and Chris Catt signed the report, and that is where the confusion arose.  AR 697.

(6th Cir. 2001)).

An IQ test above 40 is not valid for more than two years if it was taken when the claimant was between the ages of seven and sixteen. *Elam v. Commissioner,* 348 F.3d 124, 125 (6th Cir. 2003). In addition, an IQ test should be accompanied by a narrative report that comments on whether the score is valid and consistent with the claimant's degree of functional limitations. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00D6. Finally, a court does not need to consider an intelligence test where the record does not indicate the qualifications of the person who administered the test or whether the test met the Social Security standards. *Hayes v. Sec'y of Health, Educ. and Welfare,* 656 F.2d 204, 205-06 (6th Cir. 1981).

The IQ score received by the plaintiff is indicated on his elementary school transcript. AR 192. When Watts was eleven years old he received an IQ score of 70.[2] AR 192. This score of 70, since it was received by the plaintiff when he was eleven years old, would be valid only for two years. In addition, there is no indication of who gave the IQ test, nor is there any narrative report accompanying the score that would modify, verify, or explain the results. AR 192-93. For the above reasons, this elementary school IQ test is invalid, and it is unnecessary for the ALJ to consider it when making his determination.

---

[2] Both parties have agreed to that interpretation. "School records also show that Mr. Watts scored 70 on an IQ test that was given in 1963 when he was eleven years old." R. 4 (Plaintiff's br.). "Although the school records are barely legible, they appear to indicate IQ scores of 70 and 78." R. 6 (Commissioner's br.).

During the course of the proceedings the plaintiff participated in IQ testing by two examiners, Freel and Couch. Freel gave the plaintiff a verbal IQ score of 62, a performance IQ score of 67, and a full-scale IQ score of 61. AR 695. However, Freel noted that the "claimant was not cooperative with the test . . . and put forth a very poor effort." AR 695. Therefore, Freel states, "the results of this assessment are judged to be invalid . . . ." AR 695. To emphasize this conclusion, Freel reiterates, "[h]is overall intellectual functioning, which fell in the extremely low range is not considered valid." AR 695.

Couch's assessment was comparable. During this examination the plaintiff received a verbal IQ score of 66, a performance IQ score of 69, and a full-scale IQ score of 64. AR 777. Similarly to Freel, Couch notes that Watts "did not appear to be putting forth good effort during testing." AR 777. He went on to say that due to the claimant's uncooperative attitude, the "test[s] results are viewed as a minimal estimate of his current level of cognitive functioning." AR 777.

Importantly, even if the test scores were valid, not a single examiner said that the plaintiff met the description of mental retardation necessary to meet the 12.05 standard. The claimant must satisfy the diagnostic description of 12.05 as well as any one of the criteria set out in 12.05(C). *Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001) (citing 20 C.F.R. pt. 404, Subpt. P, App. 1 §12.00(A)). The plaintiff must present evidence that proves he has "significant subaverage general intellectual functioning with deficits in adaptive functioning" before age 22. *Foster,*

7

279 F.3d at 355-56 (internal quotations omitted).

Watts does not meet the description of mental retardation. Although not binding, *Cooper v. Commissioner* provides guidance for the court. 217 Fed. App'x 450 (6th Cir. 2007) (not selected for publication). In *Cooper*, the court confronted a similar fact pattern, when the claimant appealed the denial of his application for social security income. *Id.* at 451. The claimant had an eighth-grade education and had prior manual labor work experience. *Id.* The claimant argued that the ALJ erred by finding that he did not meet the requirements of mental retardation under Listing 12.05(C). *Id.* at 452. No examiner or clinical physician had ever diagnosed the claimant with mental retardation. *Id.* Instead, they determined that the claimant had borderline intellectual functioning. *Id.* In addition, the claimant performed common activities such as playing the guitar and riding a motorcycle. *Id.* The court held that because of these activities and the lack of a diagnosis, the claimant could not meet the diagnostic description in Listing 12.05(C). *Id.*

Watts has the same level of education as the *Cooper* claimant and had similar prior work experience, as a fork-lift operator. AR 920-21. Watts has not been diagnosed by a single examiner as having mental retardation. Instead, akin to the *Cooper* facts, the examiners determined that he had borderline intellectual functioning. AR 778. Watts also performed common social and daily activities such as visiting friends and family, taking care of his sons and his house, driving his car, and occasionally going to restaurants. AR 934-35.

8

Without a valid IQ score and a finding that Watts meets the diagnostic description, he cannot meet the 12.05(C) listing. The narratives written by Couch and Freel, which accompanied the plaintiff's IQ tests, explicitly state that the scores are not valid. Without a valid IQ score that falls between the range of 60 – 70, it is not possible for Watts to meet the 12.05(C) listing.[3] Furthermore, not a single examiner found that the plaintiff was mentally retarded as defined by the 12.05 listing. As a result, there is substantial evidence in the record that supports the ALJ's determination that Watts did not meet the 12.05 listing and that the (C) criteria were not present. AR 36.

Next Watts alleges that, if Freel and Couch had his elementary IQ test available to them, they would have made a different determination about the validity of their IQ scores. Watts adamantly states that the "findings were made without the consultative examiners having the benefit of review of Mr. Watts' elementary IQ and school records." R. 9. Still, the plaintiff bears the burden of demonstrating that his impairment meets a listing. *Walton v. Commissioner,* 60 F.App'x 603, 609 (6th Cir. 2003) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)). This burden includes making sure that the record is whole and supplying the court with all the evidence, medical or otherwise. *Bowen v. Yuckert,* 482 U.S. 137, 146 (1987); *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001). It was the plaintiff's burden to make sure that both Freel and Couch had the

---

[3] "C. A *valid* verbal, performance, or full scale IQ of 60 – 70 and a physical or other mental impairment imposing an additional significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P., app. 1, § 12.05(C) (emphasis added).

elementary school record and thus the IQ score before their examinations. If Watts did not meet that responsibility, he failed to meet his burden.

Furthermore, contrary to Watts's allegations, it is not clear that Couch and Freel did not have the benefit of the plaintiff's records. Couch and Freel both examined the plaintiff in 2005. AR 690, 775. The records of Watts's schooling, which included his grades and his IQ score, were already obtained by the ALJ.[4] Freel and Couch apparently had the record. Freel documents the plaintiff's grades and level of education. AR 691. Couch states explicitly that his report was only written after "the available records were reviewed." AR 778.

The plaintiff's reliance on *Muntzert v. Astrue,* 502 F. Supp. 2d 1148 (D. Kan 2007), is misplaced. In *Muntzert*, the court's overarching concern was the sequence in which the ALJ received the plaintiff's records, and that the plaintiff's school records were not obtained until after the consulting IQ examinations were complete. 502 F. Supp. 2d at 1159. Due to the timeline of events, it would have been impossible for the consulting medical professionals to have been aware of the plaintiff's school records and prior IQ test. *Id.* The timeline in this case is not as clear and distinguishes Watts's allegations that the consulting medical professionals did not have the medical records. In addition, both consulting examiners in *Muntzert* diagnosed the claimant as "Consider Functioning within Mildly Mentally Retarded Range." *Id.* In contrast, both examiners completely rule out any form of

---

[4] The Perry County Board of Education School Record Certification is dated June 3, 2004. AR 191.

mental retardation as a diagnosis for Watts.[5]

Even if Freel and Couch did not have the plaintiff's elementary school IQ records, this is not a reversible error. The ALJ's determination was supported by substantial evidence, and judicial review of the ALJ's decision to deny disability benefits is limited to determining whether there is substantial evidence to support the denial decision. *Brainard v. Sec'y of Health & Servs.*, 889 F.2d 679, 981 (6th Cir. 1989) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)). The ALJ discussed both Couch's and Freel's examinations in depth. He determined that their conclusions that the plaintiff's IQ scores were not valid and that Watts was not mentally retarded was compelling evidence and accorded them legitimate weight. He also took into account the plaintiff's own accounts of his daily lifestyle and determined that he did not have significant trouble functioning in society, an important component of the metal retardation requirement of 12.05. Based on these conclusions, the ALJ found that Watts was not disabled.

To uphold the ALJ's decision that the plaintiff was not disabled, the court need only find that the decision was supported by substantial evidence. *See Her v. Comm'r of Soc Sec.,* 203 F. 3d 388, 389-90. Whether this court would have made a different determination is irrelevant. *Id.* There is substantial evidence on the record to support the ALJ's determination.

---

[5] "Results indicate this patient does not have a mental illness or severe emotional disorder." AR 778 (Couch).

IV.     **Conclusion**

Accordingly,

**IT IS ORDERED** that the Commissioner's motion for summary judgment (R. 12) is **GRANTED**

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (R. 10) is **DENIED**.

Signed on  November 10, 2009

JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY